IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| IN THE MATTER OF: ) | CASE NO. BK07-42289-TJM |
| ) | A08-4014-TJM |
| DAVID L. SCHNUELLE and ) | |
| PAMELA S. SCHNUELLE, ) | |
| ) | CH. 12 |
| Debtor(s). ) | |
| SOUTHEAST NEBRASKA COOPERATIVE ) | |
| COMPANY and SOUTHEAST NEBRASKA ) | |
| COOPERATIVE CORPORATION, a ) | |
| Nebraska Cooperative Corporation, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| DAVID L. SCHNUELLE and ) | |
| PAMELA S. SCHNUELLE, ) | |
| ) | |
| Defendants. ) | |

MEMORANDUM

Trial was held in Lincoln, Nebraska, on January 28 and 29, 2010, on the complaint filed herein. Mathew Watson appeared for the plaintiffs and John Hahn appeared for the defendants. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(I).

BACKGROUND

The debtors, in 2004 and 2005, were farmers raising corn and beans on 2,000 acres of owned and rented land. They also had a cow/calf operation with approximately 150 cows. They borrowed money from the Cooperative to finance crop input costs. The Cooperative took a security interest in the crops to be grown and based the amount to be loaned on the guaranteed number of bushels protected by multi-peril crop insurance. Mr. Schnuelle provided certain information concerning the crop insurance. A representative of the Cooperative prepared the note and security agreement for each year and the loan proceeds were disbursed by the Cooperative for land rents and, upon receipt of invoices for seed, fuel, fertilizer and other chemicals. The debtors' cash flow for the years 2004 and 2005 was insufficient to pay the Cooperative in full. Eventually, the debtors, on November 30, 2007, filed a bankruptcy petition under Chapter 12 of the Bankruptcy Code. The Cooperative brought this adversary proceeding to obtain a determination that the obligation owed by the debtors to the Cooperative was non-dischargeable under § 523 of the Bankruptcy Code. The adversary proceeding was held in abeyance while the parties litigated the actual amount still owed by the debtors to the Cooperative. A judgment, apparently based upon a settlement agreement, was entered in the state court system in favor of the Cooperative and against both debtors in the amount of $112,054.50 plus post-judgment interest at the rate of 5% per annum from and after February 13, 2009. On the first day of trial, counsel for the Cooperative orally moved for a dismissal of the adversary proceeding as against Pamela Schnuelle, which was granted. The trial proceeded

and, following trial, counsel submitted written final arguments and legal authority. Based upon the evidence presented at trial, the debt of David L. Schnuelle represented by the Gage County, Nebraska, District Court judgment is found to be non-dischargeable. A judgment of non-dischargeability shall be entered contemporaneously with this Memorandum.

## FACTS

1. David Schnuelle has farmed in Jefferson and Gage Counties, Nebraska, for more than thirty years and during that time, he has become knowledgeable about crop production averages of the different farms he operates.

2. To protect his financial interest and that of his lenders, each year he purchases crop insurance. Generally, he has insured his growing crops through multi-peril crop insurance ("MPCI") at a level of 65% to 85% of the average crop production from his farms over the previous ten years. For crop years 2004 and 2005, he obtained MPCI policies. The Cooperative had a program pre-dating 2004 and 2005 by which it provided input financing to its eligible patrons. The amount of financing available was directly related to the dollar value of insurable crops. The Cooperative required a first security interest on the growing crops for the financed season and an assignment of any crop insurance proceeds.

3. In 2004, Schnuelle and the Cooperative entered into an agreement for crops to be grown on land in Gage and Jefferson counties that Schnuelle had farmed in previous years. To support the 2004 financing, Schnuelle provided the Cooperative with a written balance sheet reflecting his assets and liabilities as of January 29, 2004. That document contained an affirmative statement above the signature line that the information contained therein was correct as of the date the 2004 balance sheet was signed. Schnuelle knew then, and admitted at trial, that the Cooperative would rely upon the 2004 balance sheet in providing him input financing in 2004.

4. Schnuelle also signed and dated a written collateral worksheet that identified the commodity he was to produce on each farm, the number of acres that would be utilized, and the crop production number he was guaranteed for each farm through his crop insurance.

5. The information contained in the collateral worksheet was used to determine Schnuelle's 2004 total production collateral value. That amount was calculated by multiplying the stated acres by the stated guaranteed crop production numbers and then by the applicable county loan rate available from the federal government through the federal farm programs. The total crop value used for 2004 based upon the collateral worksheet was $348,744. The amount of financing Schnuelle was eligible to receive was directly affected by the amount of guaranteed crop production insurance he obtained in 2004. The 2004 collateral worksheet contained an affirmative statement above the signature line that the information contained therein was true and correct as of the date it was signed. Schnuelle knew then, and admitted at trial, that the Cooperative would rely upon the information contained within the collateral worksheet to determine the amount of input financing he would receive in 2004.

6. Schnuelle issued a written and signed promissory note to the Cooperative in the amount of $348,744 which was due and payable no later than January 31, 2005. The amount of the note was based upon the total production collateral value from the collateral worksheet.

7. Schnuelle had another operating lender, First Tri-County Bank. It financed machinery and equipment and the cattle operation. It took a first lien interest in all of Schnuelle's assets, including crops. As part of the financing package Schnuelle obtained from the Cooperative, he submitted an executed subordination agreement which subordinated the bank's interest in the 2004 crop to the first lien interest of the Cooperative.

8. The same procedure was followed for the 2005 input financing package. Documents executed in 2005 were similar to those executed in 2004, and the Cooperative financing package was based upon the amount of guaranteed crop production insurance to be obtained in 2005. The total production for 2005 was based upon the collateral worksheet and the calculations described above.

The total production collateral value for 2005 based upon the 2005 collateral worksheet was $385,725.

In addition to the documents described above, the Cooperative required Schnuelle to execute an affidavit concerning his financial condition and which warranted and represented that, as of the date the affidavit was signed, only one lawsuit for collection of the debt had been commenced and that all the financial information he provided to the Cooperative in connection with his 2005 financing package was true and correct and could be relied upon by the Cooperative. It further provided that the Cooperative could rely upon the affidavit, its warrants and representations and the financial information he had provided if the Cooperative was requested to make any future advances.

9. By late June of 2005, Schnuelle had exhausted all of his available financing. He requested the Cooperative grant him additional financing for irrigation and other miscellaneous expenses. He provided certain information to his banker at First Tri-County Bank and the banker, in support of Schnuelle's request from the Cooperative, provided a written statement that Schnuelle would shortly have proceeds in the amount of $37,000 to pay back the additionally advanced funds. In reliance upon that letter, the Cooperative advanced an additional $20,313.42. However, the representations in the letter concerning future proceeds of $37,000 proved to be incorrect and the Cooperative received less than $5,000 related to the additional advances.

10. Both the 2004 and 2005 balance sheets inaccurately listed liabilities for those two years. The 2004 document understated his liability to PHI in the amount of $30,000. The 2005 document omitted liabilities to Sanford Oil in the amount of $25,333.33 and omitted $13,000 owed to Monsanto.

11. The 2004 and 2005 collateral worksheets also contained materially inaccurate information. Insured guaranteed production numbers in both worksheets were overstated by greater than 25%. Due to these inaccuracies, the Cooperative extended at least 25% more financing to Schnuelle in 2004 and 2005 than he would have otherwise been eligible to receive through the Cooperative's input financing program. The over-extension amounted to a dollar value greater than $183,000 in additional financing.

12. In June of 2005, Schnuelle informed the Cooperative that the 2005 collateral worksheet was inaccurate. By that time, nearly all of the funds made available through the input financing package had been disbursed. The Cooperative did not learn of the material inaccuracies contained

within the 2004 collateral worksheet until after Schnuelle had instituted bankruptcy proceedings in 2007.

13. Although the Cooperative had a first lien on the 2004 and 2005 corn crops, and the sale of the corn crops was to be used to pay the debt owed to the Cooperative, Schnuelle fed at least 14,019 bushels of the 2005 crop to the cattle without the Cooperative's knowledge or consent. In addition, he also fed 2004 corn to the cattle, but he does not have any record of the amount of 2004 corn that was fed. The Cooperative has not received any payment for the corn which was fed to the cattle.

14. From April 6, 2005, through November 8, 2005, various creditors sued and obtained money judgments against Schnuelle. He did not inform the Cooperative of the lawsuits until after the Cooperative had disbursed the loan proceeds.

15. At trial, Schnuelle admitted that the balance sheets for 2004 and 2005 were inaccurate. He further admitted that the collateral worksheets concerning crop insurance were overstated by 25%. He testified that he either relied on the representative of the Cooperative to put accurate information on the documents or he was in a hurry each time he signed and submitted documents and did not read the documents. His explanations are not satisfactory. He knew that the Cooperative would rely upon the accuracy of the balance sheets and upon the accuracy of the crop insurance documents. He even admitted that the errors on the crop insurance documents were glaringly apparent. Nonetheless, he warranted that all of the documents were accurate and signed them, as he testified, so he could get the financing.

16. The balance sheets and the crop insurance documents relate to the financial condition of the debtor and all were in writing.

17. In both 2004 and 2005, in dealing with the Cooperative and the financial package he had requested, he acted with intent to deceive by his reckless indifference to or reckless disregard of the accuracy of the information in his financial documents, including the balance sheets and the collateral worksheets. He testified that when he prepared the balance sheet for each year, he did not contact his creditors to get accurate amounts. The numbers on the balance sheets were estimated and inaccurate. He had to know in preparation of the 2005 balance sheet that he still owed the oil company for fuel used in harvesting the 2004 crops. The amount owed was at least $25,000. Finally, he had to know he had not paid Monsanto for the seed in the amount of $13,000. In each year he submitted the information to the Cooperative concerning the number of acres and the number of guaranteed bushels. He admitted that the collateral worksheets upon which the Cooperative relied in making the loans in each year were inaccurate and the inaccuracy in each case was glaringly apparent.

18. In advancing additional funds in June of 2005, the Cooperative relied on a letter received from debtor's banker. Schnuelle had given the banker the information with the intent that it be forwarded to the Cooperative in support of his application for additional advances. The information in the letter was almost totally inaccurate. Although it stated he was to receive reimbursement for certain fencing within a very short period of time, he never did complete the fencing and never had a right to reimbursement. Therefore, he knew that, at least to that extent, the information he provided to the bank and the bank provided to the Cooperative was inaccurate. It had to have been submitted with an intent to deceive so that the Cooperative would advance additional funds.

19. The debtor fed corn to his cattle which was subject to a first lien of the Cooperative. He knew that he had granted a first lien interest in all of his corn grown in 2004 and 2005 and he knew that he had not discussed with the Cooperative the fact that he planned to and did feed at least 14,000 bushels of the corn during 2005. Although he testified that the representatives of the Cooperative knew of the cattle operation, he thought they knew he would be feeding the corn. The factual finding is that the representatives of the Cooperative had required a first lien be granted in the corn crops and Schnuelle never discussed with them his need or his practice of feeding their corn to his cattle.

## CONCLUSIONS OF LAW

To except a debt from discharge under 11 U.S.C. § 523(a)(2)(B), a creditor must prove, by a preponderance of the evidence, that the debtor obtained money by (1) use of a statement in writing that was materially false; (2) that pertained to his or his business's financial condition; (3) on which the plaintiff reasonably relied; and (4) that the debtor made with the intent to deceive the plaintiff. Jacobus v. Binns (In re Binns), 328 B.R. 126, 129 (B.A.P. 8th Cir. 2005).

The first element of the statute requires proof of the existence of a document as well as the content of the document. "An objecting creditor who relies on a debtor's oral misrepresentations of his or her financial wherewithal cannot satisfy the threshold requirement for nondischargeability under § 523(a)(2)(B)." Wallander v. Wallander (In re Wallander), 324 B.R. 746, 752 (Bankr. N.D. Iowa 2005). "To satisfy the second prong for nondischargeability under § 523(a)(2)(B), the writing must contain a statement of 'an entity's overall financial health and not a mere statement as to a single asset or liability.'" Id. (quoting Zimmerman v. Soderlund (In re Soderlund), 197 B.R. 742, 745 (Bankr. D. Mass. 1996)).

A financial statement is materially false if it "paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." Wallander at 752 (quoting Burbank v. Capelli (In re Capelli), 261 B.R. 81, 90 (Bankr. D. Conn. 2001)); Capital City Bank & Trust v. Kroh (In re Kroh), 88 B.R. 987, 994 (Bankr. W.D. Mo. 1988) (stating that a financial statement is materially false if it, as a whole, falsely represents the debtor's overall financial condition or contains major omissions).

Reasonable reliance is determined by looking at the totality of the circumstances. First Nat'l Bank of Olathe v. Pontow (In re Pontow), 111 F.3d 604, 610 (8th Cir. 1997). The court may consider if there were any "red flags" that would have alerted the creditor to the possibility that the financial statement was not accurate and whether minimal investigation would have revealed the inaccuracy. Id. (citing Coston v. Bank of Malvern (In re Coston), 991 F.2d 257, 261 (5th Cir. 1993) (en banc)). When a financial statement is inaccurate on its face, and the creditor has knowledge of the inaccuracies, any reliance by the creditor on the financial statement is unreasonable. R & R Ready Mix, Inc. v. Freier (In re Freier), 402 B.R. 891, 899 (B.A.P. 8th Cir. 2009).

For discharge to be barred, the debtor must have acted with intent to deceive. An intent to deceive does not mean that the debtors acted with a "malignant heart." Agribank, FCB v. Webb (In re Webb), 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000)). A creditor may establish such intent by proving reckless indifference to or reckless disregard of the accuracy of the information in a debtor's financial statement. Fairfax State Sav. Bank v. McCleary (In re McCleary), 284 B.R. 876, 888 (Bankr. N.D. Iowa 2002). Factors to consider include whether the debtor was intelligent and experienced in financial matters, and whether there was a clear pattern of purposeful conduct. Id.

(citations omitted). Once the creditor establishes that the debtor had actual knowledge of the false statement, the debtor cannot overcome the inference of the intent to deceive with unsupported assertions of honest intent. Heritage Bank of St. Joseph v. Bohr (In re Bohr), 271 B.R. 162, 169 (Bankr. W.D. Mo. 2001).

As explained above, the Cooperative has met each element of proof. The debtor intentionally submitted materially false documents to the Cooperative for the purpose of causing the Cooperative to grant him financing, which it did, to its detriment. The debt is excepted from discharge under § 523(a)(2)(B).

The Bankruptcy Code also prohibits the discharge of a debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's . . . financial condition[.]" 11 U.S.C. § 523(a)(2)(A).

To establish fraud within the context of § 523(a)(2)(A), the creditor must show, by a preponderance of the evidence, that: (1) the debtor made a representation; (2) the representation was made at a time when the debtor knew the representation was false; (3) the debtor made the representation deliberately and intentionally with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on such representation; and (5) the creditor sustained a loss as the proximate result of the representation having been made. Universal Bank, N.A. v. Grause (In re Grause), 245 B.R. 95, 99 (B.A.P. 8th Cir. 2000) (citing Thul v. Ophaug (In re Ophaug), 827 F.2d 340, 342 n.1 (8th Cir. 1987), as supplemented by Field v. Mans, 516 U.S. 59 (1995)); Blue Skies, Inc. v. Preece (In re Preece), 367 B.R. 647, 652 (B.A.P. 8th Cir. 2007). In Field v. Mans, the Supreme Court held that § 523(a)(2)(A) requires justifiable reliance, in which "[j]ustification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." Id. at 71 (citing the Restatement (Second) of Torts § 545A cmt. b (1976)). Justifiable reliance does not require an investigation, even if the failure to investigate would be considered negligent and the falsity of the representation would be readily discovered upon investigation. Fee v. Eccles (In re Eccles), 407 B.R. 338, 342 (B.A.P. 8th Cir. 2009).

"[W]hen the circumstances imply a particular set of facts, and one party knows the facts to be otherwise, that party may have a duty to correct what would otherwise be a false impression. This is the basis of the 'false pretenses' provision of Section 523(a)(2)(A)." Merchants Nat'l Bank v. Moen (In re Moen), 238 B.R. 785, 791 (B.A.P. 8th Cir. 1999) (quoting In re Malcolm, 145 B.R. 259, 263 (Bankr. N.D. Ill. 1992)). False representations may be by omission or commission. Caspers v. Van Horne (In re Van Horne), 823 F.2d 1285, 1288 (8th Cir. 1987), abrogated on other grounds, Grogan v. Garner, 498 U.S. 279 (1991). A "misrepresentation" is "not only words spoken or written but also any other conduct that amounts to an assertion not in accordance with the truth." Moen at 791 (quoting LA Capitol Fed. Credit Union v. Melancon (In re Melancon), 223 B.R. 300, 308-09 (Bankr. M.D. La. 1998)). A debtor's silence regarding a material fact may constitute a false representation actionable under § 523(a)(2)(A). Moen at 791.

To amount to fraud, a statement must be made deliberately and intentionally with the intention and purpose of deceiving. Lindau v. Nelson (In re Nelson), 357 B.R. 508, 513 (B.A.P. 8th Cir. 2006). When assessing the debtor's knowledge that the representation was false, the court must consider the debtor's knowledge and experience. Moen at 791 (citing In re Duggan, 169 B.R. 318, 324 (Bankr. E.D.N.Y. 1994)). The knowledge requirement can be satisfied with a finding that

the debtor recklessly disregarded the truth by making the false representation under circumstances where he should have known it to be false. Id.

In this case, the debtor failed to tell the Cooperative he was feeding its collateral to his cattle. He knew the corn was pledged to the Cooperative and that his loan was premised on the Cooperative's first security interest in the crop, but assumed the Cooperative was aware he intended to use some of that grain for his livestock operation. This is the type of false representation that renders the debtor non-dischargeable under § 523(a)(2)(A). Despite the debtor's assumption, the Cooperative was not aware that its collateral was being dissipated in this manner. The Cooperative justifiably relied on the debtor's misrepresentations, and it suffered a loss as a result, so the debt arising from this use of the pledged grain is non-dischargeable.

IT IS ORDERED: The complaint is dismissed as against defendant Pamela Schnuelle. The plaintiff has established the elements of 11 U.S.C. § 523(a)(2)(A) and (B) against defendant David Schnuelle. The debt is excepted from discharge. Separate judgment will be entered.

DATED:       April 9, 2010

BY THE COURT:

/s/ Timothy J. Mahoney
United States Bankruptcy Judge

Notice given by the Court to:
   *Mathew Watson
   John Hahn
   U.S. Trustee

Movant (*) is responsible for giving notice to other parties if required by rule or statute.